# Staunton

## SPENCER v. LOONEY.

### September 7, 1914.

1. LIBEL AND SLANDER—*Calling a White Man a Negro.*—The Federal Constitution accords to the negro race the same protection in life, liberty and property as to the white race, and our laws bear equally upon all without regard to race, color or previous condition, but the social condition of the two races is entirely different, and to charge a white man with being a negro is calculated to inflict injury and damage upon him, for which he has a cause of action.

2. LIBEL AND SLANDER—*Privileged Communications—Malice—Violent Language.*—The patron of a public school may, in good faith, raise the question before the proper school authorities whether or not a child attending a white school is of the negro race. The question is one of qualified privilege, but whether this privilege has been used in good faith and without malice is a question for the jury. The privilege may be lost and an inference of malice raised by the use of slanderous, defamatory, or insulting words spoken in strong and violent language disproportioned to the occasion.

3. LIBEL AND SLANDER—*Privileged Communications—Malice.*—Privileged communications are of two kinds: absolutely privileged for which no action lies though published maliciously and with knowledge of their falsity, and qualifiedly privileged, being one which is *prima facie* privileged only and in which the privilege may be lost by proof of malice in the publication. The occasion being privileged qualifiedly rebuts the presumption of malice and throws upon the plaintiff the burden of proving it.

4. WITNESSES—*Opinions.*—The opinion of a witness, not shown to be an expert, that a person, then in the presence of the court and jury, looks like he had negro blood in him, but is unable to say how much, is of little or no probative force in determining whether or not such person had as much as one-sixteenth of negro blood in him.

5. LIBEL AND SLANDER—*Damages—Neighborhood Reports.*—In an ac-

tion of slander for calling a white man and his family negroes, it is error for the trial court to instruct the jury that, in assessing the plaintiff's damages, they may consider the neighborhood reports prior to the institution of the action.      Such reports have nothing to do with the damages to be assessed by the jury.

6. LIBEL AND SLANDER—*Repetition—Malice.*—The reiteration of slanderous words is a circumstance tending to show malice on the part of the defendant.

7. EVIDENCE—*Photographs—Weight of Evidence.*—Photographs shown to be true and faithful representations of the persons they purport to represent are admissible in evidence, and it is for the jury, and not the court, to determine what credit or weight should be given to them as evidence.

8. WITNESSES—*Opinions.*—A witness who has not shown himself competent to give an opinion on the subject, should not be allowed to give his opinion as to how much negro blood a person then present had in his veins. This is especially so where he answers, "I don't know that he has any negro blood in him."

Error to a judgment of the Circuit Court of Buchanan county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Chase & Daugherty,* for the plaintiff in error.

*S. M. B. Coulling* and *J. Glen Ratliff,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action is brought by plaintiff in error against the defendant in error to recover damages for slanderous, defamatory and insulting words alleged to have been used by defendant in error of and concerning plaintiff in error and members of his family, particularly of and concerning his son, Melvin, on divers occasions and in

the presence of certain named persons and divers other good and worthy citizens of the Commonwealth.

The declaration contains a number of counts, the gravamen of which is that while the plaintiff and his wife and their children and each and all of them are white persons, of pure Caucasian blood, and each and all of them had always been reputed, esteemed and accepted by and amongst all their neighbors and other good and worthy citizens of the Commonwealth, to whom they were in any wise known, to be white persons of pure Caucasian blood, until the defendant, well knowing the premises, but contriving and maliciously and wickedly intending to insult the plaintiff and to injure him in his good name, fame and credit, and to bring him into public infamy, scandal and disgrace, and to cause it to be suspected and believed by and amongst the plaintiff's neighbors and other good and worthy citizens of this Commonwealth that the plaintiff and his wife and children were not white persons of pure Caucasian blood, but were negroes, did, in the presence and hearing of certain named persons and divers other good and worthy citizens, falsely and maliciously, and with the intent to insult and injure the plaintiff, speak and publish of and concerning plaintiff, his wife and children, the false, scandalous, malicious, defamatory and insulting words, viz: "They (meaning the plaintiff, his wife and their children) are nothing but God damned negroes, and I (meaning himself, the defendant) can prove that they (meaning the plaintiff, his wife and their children) are God damned negroes."

Defendant in error set up as his defense to this action *"First,* not guilty; *Second,* that while he confessed to speaking the words alleged in the declaration of and concerning plaintiff in error, his wife and children, and especially of his son Melvin, these words were true as to

49

them, because, 'The said plaintiff and his children and his son Melvin were negroes, and this the defendant had the right to so speak of and concerning the said plaintiff and his children and his son Melvin, because they were and are negroes . . . ' " that "This defendant never spoke of or concerning the said plaintiff's wife as in the said declaration alleged, but did so speak of and concerning the said plaintiff and his children and especially of plaintiff's son Melvin."

It appears that plaintiff in error, who was about thirty years of age when this action was brought and who is a son of Jordan Spencer, Jr., and a grandson of Jordan Spencer, Sr., (now deceased) lived in Johnson county, State of Kentucky, until he was about fifteen years of age, and has since that time lived in Buchanan county, Va., where he some years ago married a daughter of Ray Justus, a citizen of Buchanan county, and they have sev-. eral children, the oldest, about nine years of age, being Melvin above mentioned. The descendants of Jordan Spencer, Sr., have at all times for fifty years or more been permitted to attend the white public schools of both the States of Kentucky and Virginia, and they and all of them have been treated and respected by their white neighbors and associates as white people, plaintiff in error and his father having in recent years worked for defendant in error and stayed at his home, where they were treated as white people, eating at his table and sleeping in his beds. About two years prior to the trouble out of which this suit arises Jack Spencer, a brother of plaintiff in error, was accused of killing one Henderson Looney, a brother of defendant in error, and after that time, as it appears, the latter began to raise objections to plaintiff in error's boy, Melvin, attending the white public free schools of Buchanan county, accusing plaintiff in error and his family of being negroes, and

through strenuous efforts, involving costs and expenses, secured and published affidavits purporting to have been made by persons in Kentucky, by reason of which the boy, Melvin, was turned out and denied the privileges of the public schools of Buchanan county; and hence this action.

At the trial of the cause the jury rendered a verdict for the defendant, which the court refused to set aside, and entered the judgment thereon to which this writ of error was awarded.

We shall not undertake to discuss in detail the seventeen assignments of error relied on for a reversal of the judgment complained of, nor is this necessary, as many of the questions therein presented are not likely to arise upon another trial of the case.

The main questions presented in the record and most elaborately argued before this court are: (1) Were the words alleged to have been spoken and published by defendant in error actionable; and (2) whether or not the words spoken were spoken and published in the exercise of the right and privilege, if not the duty, of defendant in error in protesting against plaintiff's son, Melvin, or any other pupil not authorized by the law of Virginia so to do, attending the same public school that defendant in error's children attended.

That to speak of one or more persons as negroes, if untrue and they be white persons as a matter of fact, is scandalous and defamatory, counsel for defendant in error concedes, but contends that by reason of the adoption of the thirteenth, fourteenth and fifteenth amendments to the Federal Constitution such words are not actionable, since the negro thereby "has practically been declared the peer of the white man of the purest and best Caucasian blood;" and that "the negro being by the law declared equal to the white man, the law cannot hold that it is any more scandalous, malicious and defamatory

to call a white man a negro than to call a negro a white man.".

Upon the soundest reasoning, founded on common knowledge and authority, this contention is wholly without merit.

In *Strouder* v. *West Virginia,* 100 U. S. 303, 306, 25 L. Ed. 664, it was held that the thirteenth, fourteenth and fifteenth amendments to the Federal Constitution were designed to accord to the negro race the same protection in life, liberty and property which was already enjoyed by the white race, but nowhere in the court's opinion is reference made to the social relations of the two races. The opinion of Mr. Justice Strong, speaking for the court, in that case uses this language: "The colored race, as a race, was abject and ignorant, and that condition was unfit to command the respect of those who had superior intelligence."

In *Flood* v. *News & Courier Co.,* 71 S. C. 122, 50 S. E. 637, 4 Ann. Cas. 685, the court cites *Strouder* v. *W. Va., supra,* and other cases, as authority for the proposition that the adoption of the thirteenth, fourteenth and fifteenth amendments to the Federal Constitution have not in any way affected the social distinction subsisting between the two races, and in the opinion of the court it is said: "When we think of the racial condition subsisting between the white man and the black man, it must be apparent that to impute the condition of the negro to a white man would affect his (the white man's) social status, and, in case anyone published a white man to be a negro, it would not only be galling to his pride, but would tend to interfere seriously with the social relations of the white man with his fellow white man, and to protect the white man from such a publication it is necessary to bring such a charge to an issue quickly."

The authorities uniformly recognize that said amend-

ments to the Federal Constitution were designed to accord to the members of the negro race the same protection in life, liberty and property which was already enjoyed by the white race; that in our courts of justice the negro race stands on the same plane as the white race; and that our laws bear equally on all without regard to race, color or previous condition; but it is with the same uniformity of ruling recognized that our social conditions are very different.

As said in the case of *Spotorus* v. *Fourichou,* 40 La. Ann. 423, 4 So. 71, ''Under the social habits, customs and prejudice prevailing in Louisiana, it cannot be disputed that charging a white man with being a negro is calculated to inflict injury and damage. We are concerned with social conditions as facts. They exist and for that reason we deal with them. No one could make such a charge, knowing it to be false, without understanding that its effects would be injurious, and without intending to injure.''

What was said in that case with respect to social habits, customs, etc., prevailing in Louisiana, applies with equal force to any State or locality in which the white and negro races are established as citizens. The words charged in the declaration in this case as having been used and published by defendant in error of and concerning plaintiff in error and his family, stripped of the profane language which adds nothing to the force and effect of the words used, except perhaps as tending to prove malice, must be construed in the plain and popular sense in which the rest of the world naturally would understand them, and when so construed they charged plaintiff in error and his children with being negroes, which if untrue was calculated to inflict injury and damage upon him, and for which he has a cause of action.

While defendant in error might have, in the perform-

ance of a duty, legal or social, or in defense of his own interests, raised the question before the proper school authorities as to whether or not plaintiff in error's son, Melvin, should attend the same school that defendant in error desired his children to attend, whether this privilege has been used in good faith and without malice was the province of the jury in this and all like cases to determine. The principle of law is the same where the privilege has been lost by the use of slanderous, defamatory or insulting words, spoken in strong and violent language disproportioned to the occasion and sufficient to overcome the weight of the privilege and raise an inference of malice, as in a case for the recovery of damages occasioned by the publication of a libel. *Tyree* v. *Harrison,* 100 Va. 542, 42 S. E. 295; *Farley* v. *Thalhimer,* 103 Va. 504, 49 S. E. 644.

''From motives of public policy the law recognizes certain communications or publications as privileged—that is, communications which under ordinary circumstances would be slanderous or libelous are held to be privileged when spoken or written on or in connection with a lawful occasion. Privileged communications are of two kinds, those absolutely privileged and those qualifiedly privileged. An absolute privileged communication is one for which an action will not lie, even though the words are published maliciously and with knowledge of their falsity, whereas a qualified privileged communication is one which is *prima facie* privileged only, and in which the privilege may be lost by proof of malice in the publication of the libel or slander. The occasion of making a communication qualifiedly privileged rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff and throws upon him the onus of proving malice in fact.'' 25 Cyc. 375.

In the case here it is an admitted fact that the defendant in error, in speaking of the child of plaintiff in error, used the most profane, uncalled for and violent language; and the uncontradicted fact is that up to the time that a brother of plaintiff in error had been charged with the murder of a brother of defendant in error, the plaintiff in error and the defendant in error had been good friends, the former and his family had been working for the latter from time to time, eating at his table, sleeping in his beds and associating generally with his family, but as soon as the trial was had in which the brother of the plaintiff in error was accused of killing the brother of defendant in error, and from that time on, the defendant in error ceased speaking with plaintiff in error, appeared to be mad, and up to that time he had no objections or utterances to make as to plaintiff in error being a negro, and had made no objection to his children attending the same school with the child of defendant in error. It also appears from uncontradicted evidence in the case that defendant in error paid the expenses of a member of the school board of trustees of Buchanan county, Va., on two occasions, to Johnson county, Ky., to procure affidavits to be used by him in furtherance of his purpose, and then procured a meeting of the school trustees of Buchanan county and the dismissal of plaintiff in error's child, Melvin, from the white school, without any notice to him of these proceedings, and without giving him an opportunity to be heard in defense of himself or his child.

This court in *Farley* v. *Thalhimer, supra,* quotes from *Dillard* v. *Collins,* 25 Gratt. (66 Va.) 353, as follows: "The law holds the aegis of its protection not only over the person and property of a citizen, but vigilantly guards as equally sacred his personal reputation and character. And where one assails the character of his fellowman, and would secure himself from responsibility

upon the ground that what he has spoken or written was only done confidentially and with no intent to injure, and without malice, he must be careful that what he said or wrote comes within the well-defined qualification which the law attaches to confidential communications.''

At the trial of this cause defendant in error made no attempt to prove that plaintiff in error's wife, mother of his son, Melvin, had any negro blood in her, but did attempt to justify the speaking of the words as charged in the declaration by proof of their truth—that is, that plainiff in error and his children were negroes, and that this negro blood came through him—and upon this issue of fact the case was tried. A number of reputable citizens testified as to their acquaintance with plaintiff in error's father and grandfather, the knowledge of the witnesses as to their standing and reputation as white men, and in effect these witnesses say that they know of no fact or circumstance from which it could be fairly inferred that either the father or grandfather of plaintiff in error had any negro blood in him. It is true that several witnesses for defendant in error say that the grandfather of plaintiff in error had some of the appearances of a negro, but none were able to say what proportion of negro blood, if any, he had in him, and with one exception all agree that the Spencers were regarded as white people and that the senior Spencer and his family attended the white schools and churches. One of these witnesses, who had been a county judge, circuit court clerk, and an attorney then in practice and had known the senior Spencer fifty-five or sixty years, was asked on cross-examination: "During all the time you knew him he was regarded as a white man and so accepted among the neighbors where he lived?'' Ans. "Yes, sir.''

There is practically no evidence as to plaintiff in error's father appearing to have negro blood in him, and,

therefore, the strongest evidence adduced in the case to establish that plaintiff in error and his family were negroes, was given by defendant in error's witness, Bilisoly, from the city of Norfolk, Va., who was introduced as an expert witness. He, upon having plaintiff in error's boy, Melvin, pointed out to him in the presence of the court and jury, said: "Well, he looks like there is negro blood in him. His nose, lips and chin are very much like the negro, but it is impossible for me to tell the exact proportion of negro blood in him." On cross-examination: Q. "It is absolutely impossible for you to tell how much of negro blood, if any, that child (Melvin) has, isn't it?" A. "Yes, sir, it is impossible for me to tell just how much." On re-direct examination the witness was asked: "Look at that man (pointing to plaintiff in error) and tell us what you think of him?" A. "Well, sir, he has some of the features of a negro." Again, on cross-examination, the witness was asked: "Look at that woman (pointing to Mary Spencer, sister of plaintiff in error); what do you think of her?" A. "I would consider her a white woman." Q. "Do you think there is any blood in her other than pure Caucasian blood?" A. "No, sir, I do not; I would consider her of pure Caucasian blood; I don't think she is of negro blood.' Q. "Look at that lady (pointing to the mother of plaintiff in error). Do you think she has any negro blood in her?" A. "No, sir, I do not; she is a white woman." Q. "Look at that man (pointing to the father of plaintiff in error); what do you think of him?" A. "Let me see his hair. His hair looks a little like a negro. I believe there is some negro there; I can't say how much."

Such evidence as this, given by one not shown to be qualified to speak as an expert witness with respect to the issue in the case, has little or no probative force,

since it is but a mere expression of the witness' opinion,
borne out by no fact or circumstance proved, from which
it could be reasonably deduced that the opinion or opin-
ions of the witness that plaintiff in error and his son,
Melvin, had negro blood in them were well founded. Cer-
tainly it could not be fairly deduced from this, or any
other evidence given in the case, that plaintiff in error
or his children have as much as one-sixteenth of negro
blood in them.

.Of the nine instructions to the jury asked for by plain-
tiff in error, the trial court modified Nos. 5, 7 and 9, and
refused instructions numbered 3 and 8.

Instruction No. 5, as asked, is as follows: "The court
tells the jury that strong or violent language dispro-
portioned to the occasion may of itself raise an inference
of malice;" to which the court added, "except where the
jury may believe from the evidence that the party using
the language was engaged in a *bona fide* investigation for
a lawful purpose."

The authorities already referred to sustain the propo-
sition of law embodied in the instruction as asked. There
was evidence tending to support plaintiff in error's
theory of the case as presented in this instruction, and
it should have been given as asked. While one may be
privileged to engage in a *bona fide* investigation for a
lawful purpose, such privilege must be used in good faith
and without malice, and can never be made to serve as
a shelter for slander, or to justify the use and publica-
tion of strong or violent language disproportioned to
the occasion.

Instruction No. 7, as asked, stated as a proposition of
law, that if the jury believed from the evidence that de-
fendant in error used and uttered the words in the
declaration mentioned in bad faith and with malice, then
plaintiff in error was entitled to recover in this action

damages on account of using and uttering said words, and correctly told the jury how the damages should be assessed; but the court so modified the instruction that the jury could not find damages in favor of plaintiff in error unless they also believed that he and his son, Melvin, each had less than one-sixteenth negro blood in them. We do not see, however, that plaintiff in error was prejudiced by the modification of this instruction, since the same proposition of law propounded in the modification is contained in his own instruction No. 9, as asked and given by the court, with a modification.

Instruction No. 9, as asked, is as follows: "The court instructs the jury that even should they believe from the evidence that it was the neighborhood report prior to July 11, 1911, that the plaintiff and his children were negroes, yet if they believe that the said plaintiff's children were permitted to go to and attend the public free schools of this State until the statements of the defendant; and they believe that the defendant made the statements that the plaintiff and his children were negroes, and secured and published affidavits that the plaintiff and his children were negroes and that by reason of the defendant's said statements the plaintiff's child Melvin Spencer was refused admittance and attendance to the public free schools of Buchanan county, then you must find for the plaintiff and assess his damages at such sum as you believe he has suffered and will suffer by reason of the refusal of his children admittance to the public free schools of Buchanan county, unless you believe the words spoken by the defendant and published in the affidavits were true, and the said plaintiff's children have one-sixteenth or more negro blood in them."

The modification of this instruction complained of, in effect told the jury, that they might, in assessing damages in the case, consider the neighborhood reports prior to July 11, 1911, referred to in the instruction.

The question submitted to the jury by the instruction, as asked, was, in short, whether plaintiff in error's children had one-sixteenth or more negro blood in them, and mere reports in the neighborhood prior to the origin of this suit had nothing whatever to do with the jury's assessment of damages in the case, if their verdict was to be for the plaintiff.

Plaintiff in error's instructions Nos. 3 and 8, which were refused, are as follows:

No. 3. "The court tells the jury that if they believe that Jordon Spencer, Senior, the great-grandfather of Melvin, had less than one-half negro blood and more than one-half white or Indian blood and that if they believe that his wife was a white woman, with no negro blood in her, and that then Jordon Spencer, Junior, the grandfather of Melvin, would have less than one-fourth negro blood in him and then if they believe that the wife of Jordon Spencer, Jr., had no negro blood in her, that George Spencer, the father of Melvin, would have less than one-eighth negro blood in him, and that if they believe that the wife of George Spencer, and the mother of Melvin, was a white woman with no negro blood in her, that then Melvin Spencer has less than one-sixteenth of negro blood in him, and is a white person and is entitled under the laws of the State of Virginia to attend the public white free schools of Buchanan county, Virginia."

No. 8. "The court instructs the jury that if from the evidence they believe that the words contained in the declaration were used by the defendant, and were untrue, and if they further believe from the evidence that the defendant had reiterated the said words, then this is a circumstance tending to show malice on the part of the defendant."

These instructions we think were proper in view of the facts which the evidence in the case tended to prove.

The giving of instructions Nos. 4 and 7 for defendant in error is assigned as error. These instructions, it is true, in effect told the jury that if they believed from the evidence that plaintiff in error and his son, Melvin, had one-sixteenth or more of negro blood in their veins they should find for the defendant, but when considered along with other instructions given by the court and which we have indicated should be given at another trial of the case, we do not consider it necessary to discuss said instructions 4 and 7 further.

In the course of the trial plaintiff in error offered in evidence two photographs, which he stated were correct pictures, the one a picture of his grandfather and the other a picture of his grandfather's daughter and her children, sent to plaintiff in error's father in a letter a few years prior, but upon objection made by defendant in error the court would not permit the photographs to be shown to the jury, stating as a reason for the ruling that the court was of opinion that they were taken from other photographs: to which ruling plaintiff in error duly excepted, embodying in the exceptions the reasons of the court therefor.

We are of opinion that this ruling was erroneous. There was no evidence in the case contradictory of plaintiff in errror's statement that the photographs were true and faithful representations of his grandfather and aunt and her children, and it was for the jury and not the court to determine what credit or weight should be given them as evidence in the case. 1 Greenleaf on Ev. (16 ed.) sec. 439-h; 17 Cyc. pp. 414-15, and note p. 416.

With respect to assignments of error 11, 12 and 13, we deem it necessary to say only that the evidence admitted over the objections of plaintiff in error set out in his bills of exceptions, which are made the ground of these assignments of error, was immaterial and irrelevant to

any issue involved in the case, and, therefore, should have been excluded.

One John W. Flanagan, a witness on examination in chief for the defense, who had not shown himself competent to answer such a question, was, over the objection of plaintiff in error, asked and permitted to answer the following question: ''From his (Melvin's) lips, nose, yellow skin, how much (negro blood) do you think he is?'' A. ''From his appearance it looks like to me he had more than one-sixteenth; I don't know that he has any negro blood in him.'' The overruling by the court of his objection to this question and answer constitutes plaintiff in error's fourteenth assignment of error, which assignment is also well taken. Not only had the witness not shown himself competent to answer the question, but on the contrary he had made express statements to the effect that he was not.

The evidence given by one George Stevenson, a witness for the defense, permitted to go to the jury over the objection of plaintiff in error, was not only without probative force but was wholly irrelevant and immaterial to any issue in the case and should have been excluded.

For the foregoing reasons the judgment complained of is reversed, the verdict of the jury set aside, and the cause remanded to the circuit court for a new trial therein to be had in accordance with the views expressed in this opinion.

*Reversed.*