# Richmond

LOUIS SNYDER AND LARRY COHEN v. EDITH FATHERLY.

March 24, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Louis B. Fine* and *James G. Martin*, for the plaintiffs in error.

*Herman A. Sacks* and *Henry Legum*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

Edith Fatherly, hereafter called plaintiff, recovered a judgment against Louis Snyder and Larry Cohen, hereafter called defendants, for slander and insulting words.

The case was tried three times. On the first trial the jury returned a verdict in favor of the plaintiff for $1,500.00, which was set aside by the court because it was of opinion that it had given an instruction which was erroneous. The second trial resulted in a verdict and judgment for the plaintiff for $3,000.00. From this judgment a writ of error and supersedeas was allowed by this court and the judgment was reversed and the case remanded for a new trial on the ground that the trial court erred in granting an instruction which told the jury if they believed from the evidence that

the defendants had not established the truth of their plea of justification, they could take that fact into consideration in determining whether the defendants were actuated by malice or not in using the language complained of (see *Snyder* v. *Fatherly*, 153 Va. 762, 151 S. E. 149). On the third trial there was a verdict and judgment for the plaintiff for $3,000.00, to which judgment this court allowed a writ of error and awarded a supersedeas, and hence this case is again here.

At the threshold we observe that there have been three verdicts of as many juries, and two judgments of the trial court, presided over by different judges, in favor of the plaintiff, all of which is entitled to great weight and respect.

Five assignments of error are presented by the defendants. The first calls in question the action of the court in refusing to set aside the verdict as contrary to the law and the evidence.

Louis Snyder was the principal owner of a large dry-goods store in Norfolk, Virginia, of which Larry Cohen was one of the managers, and the particular duty assigned to him was that of buyer for several departments, including that of ladies' underwear, in which the plaintiff was engaged as saleswoman, and as buyer prior to the employment of Mr. Cohen. At the time of the happening which is the basis of this case Cohen had been in the employ of Snyder only about three weeks. The plaintiff had been an employee in the store for some five years. On Monday, the 24th of January, 1927, before the closing hour of the store, Mr. Cohen was heard, by the plaintiff and another employee, Mrs. Hettie Singleton, to tell L. Snyder and Sol Snyder, a co-owner, that the plaintiff, "Mrs. Fatherly was fixing to steal something," and Mr. Snyder said: "See what it is and where she puts it." These are, substantially, the words which are complained of. The plaintiff's declaration, in two

of its counts, named gowns as the article which was the subject of the theft charged, while the defendants' plea of justification stated that the plaintiff stole certain hose at the time specified.

A brief statement of the most pertinent portions of the evidence will disclose the origin of this diversity of statement, as well as furnish the basis for the action of the trial court, complained of, and our determination thereof presently.

This court held, in *Snyder* v. *Fatherly*, 153 Va. 762, 764, 151 S. E. 149, involving the same parties and practically the same evidence and issues, and arising out of the same occurrence, that the occasion was one of qualified privilege. This question is one of law for the court and the holding is so clearly authoritative that no citation or further statement is necessary. As was aptly stated by the learned judge of the trial court in his written opinion, "the question to be determined is whether or not the privilege was abused."

The plaintiff testified that in the early part of January, 1927, she was checking over, by the bill of lading, quite a large shipment to the firm of long-sleeved gowns which had been purchased in New York, personally, by Mr. Cohen; that Mr. Snyder, who was on the floor at the time, asked her if she thought she could sell them, and she told him that they were *"passé,"* that women did not use them any more, and that Mr. Cohen had paid more for them than they could purchase them in Norfolk for; that Mr. Snyder directed her to send them back and while she was boxing them up for this purpose, Mr. Cohen came on the scene and severely reprimanded her, saying that she was there to sell things and not to have anything to do with buying or sending anything back, and asked her if she knew what happened to people around there who exercised too much authority and went over the heads of their "bosses;" and that he "nagged" and "snapped" at her, for this, for a

week afterwards. Mr. Cohen denied that any such conversation took place between himself and the plaintiff saying that he did not make the trip to New York to buy merchandise until after the time of the alleged incident. In relation to this incident Mr. Cohen testified as follows:

"Q.   Regarding Mrs. Fatherly, did you have any misunderstanding with Mrs. Fatherly regarding the gowns?

"A.   None whatever, so help me God."

It is worthy of remark here that this statement of the plaintiff, to the extent of Mr. Snyder's connection with it, is uncontradicted. The plaintiff further testified that Mrs. Singleton, another employee, had put away, on Saturday night before she was discharged, in a show case, three gowns for a customer who was to call later for them, and on Monday afternoon following Mr. Cohen saw them and asked plaintiff why they were there and on being told the circumstances he said: "It looks mighty suspicious. The customer hasn't come back for them. You put those gowns in there for a different purpose than that but you didn't get away with it." This incident, except what Mr. Cohen was alleged to have said to plaintiff, was corroborated by Mrs. Singleton, Mrs. Cohen (not related to defendant, Cohen) who was the conditional purchaser, and by the defendant, Cohen. He, however, denied the statement attributed to him by the plaintiff relating to herself.

Mrs. Sarah E. Francis, a witness for the plaintiff, testified that she had worked for Mr. Snyder on Saturdays and Mondays and extra days for about seven years and that she went back there to work quite a while after Mrs. Fatherly had been laid off and that Mr. Cohen asked her if she knew whether Mrs. Fatherly was there at the time and she replied that she heard she had quit, and he said: "She didn't quit. She was fired for stealing." Witness said that was a pretty broad statement to make if she was not guilty and Mr. Cohen said that Mrs. Fatherly was going to take it to

court and sue Mr. Snyder and that they were going to make an example of her (plaintiff) in court for carrying Mr. Snyder to court. Mr. Cohen denied this in these words: "Even if I had thought of a thing like that I would not have lowered myself to talk to an employee at all of things like that about a girl."

Mrs. Hettie Singleton, a saleswoman in the hosiery department, testified that she was passing by and overheard Mr. Cohen tell Mr. Snyder that plaintiff was fixing to steal something and that the latter said: "See what it is and where she puts it." This witness further said that she left Snyder's employ about a month or six weeks after plaintiff was discharged because she could not get along with Mr. Cohen, and that he threatened her if she testified for Mrs. Fatherly. With respect to this testimony Mr. Cohen testified:

"Q. You know Mrs. Singleton, don't you?

"A. Yes.

"Q. Has she got anything against you or did she have anything against you then?

"A. I don't know why she should.

"Q. What?

"A. I don't know why she should.

"Q. You heard her testify today as she testified before, didn't you?

"A. I heard her, yes.

"Q. Was she telling the truth, or not?

"A. She was telling lies.

"Q. She was telling lies?

"A. Positively.

"Q. What?

"A. She was lying.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

"Q. Did you ever give any reason for Mrs. Singleton testifying the way she did?

"A. I can't tell you.

"Q. Let me refresh your memory.

"A. All right, sir.

"Q. At the first trial, on page 146, I asked you: '(Q) Mrs. Singleton hasn't anything against you, has she?

"A. She certainly has.

"Q. She doesn't like you?

"A. No, she don't like me.

"Q. Why?

"A. A lot of others don't like me because I am too smart for them.

"Q. Why don't she like you, because you are too smart?

"A. I don't allow anybody to put anything over on me if I can help it.

"Q. What has she got against you?

"A. I don't know. She just don't like me.

"Q. How do you know that?

"A. She just would not listen to what I would tell her when she was there and she never obeyed my orders which is my position to tell the girls.

"Q. She would not obey your orders and you never dismissed her?

"A. I am sorry to say I asked for her dismissal two or three weeks before and they said: 'Wait until you get more posted on the stock and then possibly we will let Mrs. Singleton go out because she is too loud in the store.' "

"Q. Did you say that?

"A. I can't remember whether I said all of that, or not. Possibly I did if it is down in the record."

Mrs. Beck and Mrs. Land, cashier and assistant book-keeper, respectively, in the Snyder store testified that they saw from their office, on the balcony above, Mrs. Fatherly take something, Mrs. Beck said a pair of hose from a box, and Mrs. Land said a tan article, which she put in her sweater pocket, and Mrs. Land said she went over to her

(plaintiff's) department and put the article in a box on the bottom shelf of the underwear department and the witness told Mr. Marx, the office manager, of this. It is remarkable that this was the last that was seen or heard of the article in question.

Mr. Louis Snyder testified that he saw practically the same thing that Mrs. Beck and Mrs. Land had seen. He was questioned as follows:

"Q. Did you ever find the hose?
"A. No.
"Q. Did she take them out?
"A. I suppose so.
"Q. Did you ever see her take them out?
"A. No, sir.
"Q. That was Monday night?
"A. Yes."

The plaintiff denied that she took the hose and Mrs. Singleton said that she was on duty in the hosiery department at the time of the alleged theft and that if Mrs. Fatherly had been there and taken hose she would have seen her but she did not.

The declaration was filed on the first Monday in March, 1927, and the case was set for trial in April, 1927. On the 4th of April the defendants filed their grounds of defense, which did not include the plea of the truth, and on the 7th of May the plea of justification or truth was filed. The defendant, Cohen, on cross-examination, was interrogated as follows:

"Q. When this suit was brought you and Mr. Snyder both knew that this lady had stolen hose, didn't you?
"A. Yes.
"Q. You knew that. Do you know why that plea was filed late, of your own knowledge?
"A. I gave Mr. Snyder plenty of hell about that."

The reference to the filing of the plea and this bit of

testimony of Cohen is noted because it bears upon the question of the state of mind of the witness, who is a defendant, at the time he claims to have reprimanded his employer, in rather shocking terms, and this taken with the other testimony, of a similar character relating to the plaintiff, as to happenings, both before and after the time of the alleged grievances, goes far to establish in Cohen a wanton disposition, grossly careless of the rights and feelings of others, amounting to ill will, which strongly imports malice.

Two days after the alleged theft the plaintiff was discharged by notice on a slip of paper to the effect that her services were no longer required. This paper, signed by L. Snyder, was enclosed in her pay envelope and handed to her at the closing hour as she left the store. When she became aware of the fact that she had been discharged she endeavored to find Mr. Snyder and, not succeeding, she and her husband drove to Mr. Snyder's home. They did not find him in on the first visit but were told that he would be back in the course of an hour. They called the second time and the plaintiff showed him the slip of paper telling him that no reason was assigned for her discharge and Mr. Snyder assured her that business was dull and that they were just laying off some employees. The plaintiff said that she did not think that was so, but that it was because of the rumors around the store about her character and that she expected to make somebody prove it. In this connection she was asked on the witness stand as follows:

"Q. What did he say to that?

"A. He said: 'Oh, no, Mrs. Fatherly. That is just girls' talk in the store and there is nothing to it. You know how girls will talk. You come on back in to work tomorrow morning just like nothing had happened,' and he gave me $10.00. He said: 'You take the $10.00 just like you would have gotten it, and $2.00 will apply to your account and come back to work.' * * * * *.''

Plaintiff went back to work on the following morning but left that evening because the employees ignored her and snubbed her and on that account the conditions were so intolerable that she could not stand it.

Mr. Snyder admitted the truth of this tesmony to the extent of telling plaintiff that business was dull and that that was the reason for discharging her, but said that he gave her the money and took her back because her husband threatened him with bodily harm if he refused to do so and that he did not want to say, in the presence of her husband, that she had been discharged for stealing. It is thus apparent that in many important particulars the evidence is wholly irreconcilable.

In the case of *Cotulla* v. *Kerr*, 74 Tex. 89, 11 S. W. 1058, 1060, 15 Am. St. Rep. 819, 824, it was said: "Whether or not defendants were guilty of circulating and publishing the libel, and whether they acted maliciously, were questions for the jury under proper instructions."

"* * * * the great weight of authority is to the effect that in such actions" (libel and slander) "the question of malice, or of motive on the part of the defendant in making the publication in question, is for the determination of the jury. * * *" 17 R. C. L. 427, section 185.

In the case of *Farley* v. *Thalhimer*, 103 Va. 504, 507, 49 S. E. 644, 645, it was said: "It seems too well settled in this State to admit of extended discussion that while it is within the province of the trial court to determine whether or not the occasion when alleged slanderous or insulting words were spoken or written was privileged; whether they were spoken or written with or without malice is a question for the jury under proper instructions. *Dillard* v. *Collins*, 25 Gratt (66 Va.) 353; *Chaffin* v. *Lynch*, 83 Va. 106, 1 S. E. 803; *Id.*, 84 Va. 884, 6 S. E. 474; *Strode* v. *Clement*, 90 Va. 557, 19 S. E. 177; *Reusch* v. *Roanoke, etc., Co.*, 91 Va. 534,

22 S. E. 358; *Brown* v. *N. & W. R. Co.*, 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472; *Tyree* v. *Harrison*, 100 Va. 542, 42 S. E. 295."

In the case of *Farley* v. *Thalhimer, supra,* it is further said: "But, though the occasion is privileged, strong and violent language, disproportioned to the occasion, may raise an inference of malice, and thus obviate the privilege that would otherwise attach to it, and whether such an inference is to be drawn from the language used or the circumstances in which it is used, etc., is a question for the jury. The questions of good faith, belief in the truth of the statement, and the existence of actual malice remain also for the jury. *Tyree* v. *Harrison, supra,* and other authorities cited."

The court, continuing, said: "Therefore, there was a conflict in the evidence throughout on every material question in the case, and it is for the jury to determine the credibility of the witnesses and the weight to be given to their statements. In other words, there was evidence tending to sustain the theory of the plaintiff in error, and hence the question of whether there was malice on the part of the defendant in error should have been submitted to the jury."

Amer. & Eng. Ency. of Law (2d Ed.), volume 18, page 1050: "But where there is evidence of malice to rebut the occasion of privilege the judge must submit the case to the jury. In order to entitle the plaintiff to have the question of malice left to the jury, he need not show circumstances necessarily leading to the conclusion that malice existed, or such as are consistent with its non-existence, but they must be such as raise a probability of malice, and be more consistent with its existence than with its non-existence." *Fresh* v. *Cutter*, 73 Md. 87, 20 Atl. 774, 10 L. R. A. 67, 25 Am. St. Rep. 575; *Jackson* v. *Pittsburgh Times*, 152 Pa. St. 406, 25 Atl. 613, 34 Am. St. Rep. 659; *Strode* v. *Clement*, 90 Va. 553, 19 S. E. 177.

While, as we have said, the evidence was hopelessly

conflicting as to many important particulars, still a *resumé* of it reveals circumstances and facts that potentially support the contention of the plaintiff.

First: The plaintiff was the buyer of the merchandise for her department before the advent of Cohen into the business, and subsequently there arose a question between the principal owner and the plaintiff as to whether a purchase made by Cohen was an advantageous one; the owner, Snyder, deciding that it was not, ordered the goods to be returned. This was not denied by Mr. Snyder, the person above all others to state as to its truth or falsity. Cohen's repudiation of having had any misunderstanding with the plaintiff in connection with it, and his dramatic appeal to the Maker to sustain him, evidently did not impress the jury.

Second: A pugnacious and antagonistic spirit on the part of Cohen runs through the testimony finding vent in a declaration that he had given his employer "hell," and branding a woman as a liar, and the statement that the plaintiff had been "fired for stealing," evincing an ill will, which must have been effective if not controlling in the determination of the jury.

Third: The patent discrepancies between the testimony of Mr. Snyder and Mr. Cohen on former trials of the case and the present trial, and the repudiation by Mr. Snyder of the whole thing when he was confronted by the plaintiff seeking to ascertain the cause of her discharge.

We think there was convincing evidence that there was publication of the words complained of by the defendants.

"The fact that the defendant communicated the defamatory words to but one person, and even then accompanied the communication with an injunction of secrecy, will not prevent his utterance from being actionable." 17 R. C. L. 316, section 56.

■ "There may be a publication of a slander by addressing the defamatory words directly to the plaintiff, if others are present and hear the words spoken." 18 Amer. & Eng. Ency. of Law (2nd Ed.) page 1017.

In the case of *Adams* v. *Lawson*, 17 Gratt. (58 Va.) 250, 94 Am. Dec. 455, it was said: "To constitute a publication, it is not necessary that the contents of the writing should be made known to the public generally. It is enough, it is said, if they are made known to a single person: Holroyd, J., in 6 Eng. Com. L. 375."

■ Mrs. Singleton heard the defamatory words spoken as she was passing Mr. Snyder and Mr. Cohen. There was testimony that the clerks in the store said Mrs. Fatherly had been discharged for stealing. Their treatment of her when she returned on the following day showed that they knew it. How did they know it, if it was not overheard at the time, or if the defendants did not make it known? Mr. Cohen told Mrs. Francis sometime afterwards that Mrs. Fatherly did not leave of her own volition but that she was "fired for stealing."

Our conclusion is that the trial court committed no error in refusing to set aside the verdict of the jury.

We come now to the consideration of the remaining assignments of error and we shall address ourselves first to the assignments numbered 4 and 5 together, as they are co-related. No. 4 attacks the verdict as excessive in amount. The plaintiff instituted suit for $10,000.00 damages and the verdict of the jury was for $3,000.00. No. 5 urges that the court should have set aside the verdict because of improper argument of plaintiff's counsel and urges that its effect was to create an atmosphere of passion and prejudice which was reflected in the amount of the verdict.

■ "* * * * The amount of damages recoverable is peculiarly within the province of the jury, but the trial court should give instructions on the subject * * * *." 17 R. C. L. 429, section 188.

██ "* * * * * The following elements may be taken into consideration in assessing such (general) damages: Injury to feelings, mental suffering, injury to character and reputation, and similar injuries, incapable of definite money valuation; the nature of the imputation, including the time, manner and language in which the charge was made, and the character, condition, and influence of the parties. * * *" 17 R. C. L. 430, section 189.

The defendants cite the case of *Jordan* v. *Melville Shoe Corp.*, 150 Va. 101, 142 S. E. 387, 388, as sustaining their contention as to this assignment. We here quote rather freely from that case to show its inapplicability for the purpose stated and to point out that it is most respectable authority for the contrary view.

██ "So far as the present question is concerned it is perfectly well settled that in insulting language cases no actual damages have to be proved in order to recover substantial compensatory damages. The law implies damages from the speaking of insulting words.

"Thus in *Williams Printing Company* v. *Saunders*, a libel case, 113 Va. 156, at page 180, 73 S. E. 472, 478 (Ann. Cas. 1913E, 693) it is said: 'From the publication of such libelous charges the law implies malice, *as well as damages to the plaintiff;* and the jury may, therefore, on proof of the publication only, render a verdict for substantial damages.' (Italics added.)

"In *Ramsay* v. *Harrison*, 119 Va. 682, 689, 705, 89 S. E. 977, a case of insulting words, the following instruction was approved by the court (pages 685 and 707 [89 S. E. 978]): 'The court instructs the jury that the law presumes that damages result from the utterance of insulting words, and it is not necessary for the plaintiff to prove either actual or pecuniary loss in order to recover.'

"The opinion at page 707 of 119 Va. (89 S. E. 985) quotes from *Boyd* v. *Boyd*, 116 Va. 326, 82 S. E. 110, Ann. Cas.

1916D, 1173, as follows: 'The law presumes that damages result from the utterance of insulting words made actionable by our statute, just as it does where the words uttered are actionable *per se;* and it is not necessary in either case, in order to recover, to prove actual or pecuniary loss.' "

There is plenty of evidence in the case in judgment showing the injury to the plaintiff's feelings, her mental suffering, injury to her character and reputation, reflected by the ignominy in which her former associates held her on account of the defamation. We perceive nothing to lead us to the conclusion that the jury was actuated or controlled by passion or prejudice.

As to the assignment with relation to the alleged improper argument of plaintiff's counsel we have to say that in our opinion the holding of this court in the case of *So. Ry. Co.* v. *Johnson,* 151 Va. 345, 361, 146 S. E. 363, 368, is applicable and controlling. In that case it was said: "The record shows that defendant's counsel made no objection to the alleged improper remarks at the time of their utterance, nor was any reference made to them until after verdict, when counsel for defendant moved the court to set aside the verdict because of them. The objection and motion came too late." This is precisely the case in judgment. *Wickham* v. *Turpin,* 112 Va. 236, 70 S. E. 514, contains another pronouncement of this court on the same subject to the same effect.

The case of *N. & W. Ry. Co.* v. *Eley,* 152 Va. 773, 148 S. E. 678, cited by defendant's counsel, is not in point because in that case defendants' counsel objected to the offending argument of plaintiff's counsel but was overruled by the court. It is true that defendant's counsel did not except to the ruling, but the record shows the objection made and the ruling of the court thereon. In the case in judgment no objection was made until after the verdict of the jury and judgment of the court. It comes too late.

We think there is no error in the action of the trial court in respect to the assignments of error numbered 4 and 5.

Instruction No. 1 is objected to because, in the opinion of defendants' counsel, there was no evidence upon which to predicate it. From the above statement of the evidence it follows that we have reached a contrary conclusion, and hence we think that the instruction is a correct statement of the law.

In our opinion there is, in the record, evidence to sustain instruction No. 2, and that there was no error in granting it. It was urged in argument that it is inconsistent with instruction No. 9, but, if so, the vice is with the latter and it might well have been modified to conform with the former, and inasmuch as No. 9 is favorable to the defendants and was given at their instance, no harm could result to them from the situation. Instruction No. 9 was taken from an expression by this court found in its opinion in this case in 153 Va. 762, at page 764, 151 S. E. 149. But the court was not discussing an instruction. We conceive that there may be a legal proposition, perfectly sound as an abstract statement of law, but which would not be favored as an instruction to a jury for the reason that, in its form, unrelated to the evidence in the particular case, and unmodified to suit or fit the evidence, it might mislead the jury and thus defeat its legitimate purpose. Instructions Nos. 6 and 7 correctly express the law applicable to the subjects, in this case, with which they deal, and instructions a, b, and c, asked for by the defendant, were rightly refused for manifest reasons.

Instruction No. 3 is as follows: "The court instructs the jury that malice may be inferred from a repetition of the charges, if false, and it is not necessary for the plaintiff to prove that the defendants were actuated by hatred or ill will towards her in making those allegations against her." Defendants' counsel objected to this instruction for this

reason: "It is submitted that in the case of a privileged communication actual malice must be shown, and implied malice will not suffice." A principle was announced, in an instruction somewhat akin to this, by this. court in the case of *Spencer* v. *Looney*, 116 Va. 767, 82 S. E. 745, 749. The instruction in that case was in these words: "The court instructs the jury that if, from the evidence, they believe that the words contained in the declaration were used by the defendant, and were untrue, and if they further believe, from the evidence, that the defendant had reiterated the said words, then this is a circumstance tending to show malice on the part of the defendant."

This court said in the case of *Lincoln* v. *Chrisman*, 10 Leigh (37 Va.) 338: "However questionable the practice may seem, to permit the introduction of evidence of words spoken at a different time, in order to prove malice in speaking those charged in the declaration, it seems now to be too firmly established to be shaken."

The instruction quoted from the case of *Spencer* v. *Looney*, *supra*, was approved by the court in the case of *Lightner* v. *Osborn*, 142 Va. 27, 127 S. E. 314.

■ "As a general rule it is considered competent for the plaintiff to show, as evidence of malice, that since the speaking or publication of the slander or libel which is the subject of the action, the defendant has repeated or republished the same, even though such repetition or republication has taken place since the commencement of the action, and the operation of this rule is not confined merely to a repetition or republication of the same words as those which are the basis of the action, but extends to the speaking or publication of words having the same import or conveying the same charge." Amer. & Eng. Ency. of Law, volume 18, page 1009.

■ The instruction No. 3 went too far in that the jury was told that they might *infer* malice from the repetition of the charges, if false, rather than that it was an act or circum-

stance which tended to show malice on the part of the defendants, and that it should be considered along with all the other evidence tending to show malice. In our view of the case, there being other evidence, quite convincing, of malice, as we have pointed out, no other verdict could have been properly found in the case in judgment than that rendered by the jury, and therefore we shall not reverse and remand the case on account of the error in giving this instruction.

We here append the instructions which were given and those which were refused by the court.

"1. The court instructs the jury that the employer and employee are both liable for the wrongful acts of the employee while he is acting in the ordinary course of the employer's business and within the scope of his employment. And so, if you believe, from the evidence, that the defendant, Larry Cohen, while acting within the scope of his employment in the business of the defendant, Louis Snyder, maliciously and falsely spoke of and concerning the plaintiff, the slanderous and insulting words substantially as alleged in the declaration, you must find for the plaintiff against both defendants.

"2. The court instructs the jury that even though you believe, from the evidence, that the occasion on which the accusations against the plaintiff made by the defendant, Larry Cohen, was privileged, as set out in another instruction; yet, if you further believe, from the evidence, that those accusations were not made in good faith, and in an honest belief in the existence of the matter of which the plaintiff was accused, or were given unnecessary publicity, or were made maliciously, then the defendants will not be protected by the aforesaid privilege, and your verdict should be for the plaintiff against both defendants.

"3. The court instructs the jury that malice may be inferred from a repetition of the charges, if false, and it is

not necessary for the plaintiff to prove that the defendants were actuated by hatred or ill will towards her in making those allegations against her.

"4. The court instructs the jury that as to the defense of truth, the burden is on the defendants to prove, by a preponderance of the evidence, that the plaintiff did actually steal from the defendant, as alleged in their plea of truth, but the burden is on the plaintiff to prove her case.

"5. The court instructs the jury that even though you believe, from the evidence, that the plaintiff was guilty of adultery as testified to by the police officer, the plaintiff would still be entitled to recover if you believe that she was slandered as set out in the other instructions.

"6. The court instructs the jury that the law presumes damages to result from the uttering of false slanderous or insulting words and if you believe from the evidence that defendant, Larry Cohen, used such words of and concerning the plaintiff, it is not necessary for the plaintiff to prove actual or pecuniary loss in order to recover, provided the jury believe, from the evidence, that the plaintiff is entitled to recover in this action.

"7. The court instructs the jury that in determining the amount of damages to which the plaintiff may be entitled, if you believe she is entitled to recover, you shall take into consideration all the facts and circumstances of the case as disclosed by the evidence, the nature and character of the charges, the language in which those charges were expressed, the occasion on which they were published, the extent of their circulation, the probable effect upon those to whose attention they came, and the probable effect upon the plaintiff's personal feelings and her standing in the community in which she lives; and if under the instructions herein she is entitled to recover, you shall award her such sum by way of damages as will fairly and adequately compensate her:

"1. For the insult to her, the injury to her feelings, including any pain, mortification and mental suffering inflicted upon her; and 2. For any damage to her reputation as an honest woman and citizen.

"8. The court instructs the jury that this suit is for damages alleged by the plaintiff to have been caused by a statement of Larry Cohen to L. Snyder on Monday, January 24, 1927, to the effect that the plaintiff was stealing.

"9. The court instructs the jury that it was the positive duty of Larry Cohen to tell L. Snyder the report he had heard as to the stealing of the plaintiff, this being a privileged communication.

"10. The court instructs the jury that unless they believe from the evidence that Larry Cohen on January 24, 1927, spoke the words concerning the plaintiff substantially as alleged in the declaration, that the words were untrue, and also that he spoke these words with actual malice, and without reasonable cause, it is the duty of the jury to find for the defendants.

"11. The court instructs the jury that what was said between the Snyders and Cohen and the plaintiff was privileged, and the defendants would not be liable therefor unless they spoke both falsely and with actual malice as alleged in the declaration.

"12. The court instructs the jury that the defendants had the right to investigate the conduct of the plaintiff in the store, and to state what they considered her conduct, this being a privileged matter, and the defendants would not be liable unless their statements were false and without reasonable cause and also unless they made the statements with actual malice against plaintiff.

"13. The court instructs the jury that before they can under their oaths find for the plaintiff they would have to believe from the evidence all of the following things, to-wit:

"1. That the plaintiff did not steal on January 24, 1927.

"2. That defendants stated that she did steal substantially as alleged in the declaration.

"3. That in stating that plaintiff stole defendants had no reasonable cause so to state and spoke with actual malice.

"14. The court instructs the jury that even if they should find for the plaintiff they can allow only such actual damages, if any, as the plaintiff suffered, and in no event any punitive damages.

"15. The court instructs the jury that the burden is upon the plaintiff to prove her case by a preponderance of the evidence."

### Instructions Refused

"a. The court instructs the jury that there was reasonable grounds for Larry Cohen reporting to L. Snyder that the plaintiff was stealing.

"b. The court instructs the jury that there is no evidence that Mr. Cohen spoke with malice when he reported to Mr. Snyder.

"c. The court instructs the jury that there is no evidence in this case that the defendants acted with malice."

We affirm the judgment of the trial court.

*Affirmed.*

EPES, J., dissenting.