### UNITED STATES v. O'BRIEN.
#### No. 3095.

Circuit Court of Appeals, Fourth Circuit.
June 17, 1931.

Davis G. Arnold, Associate Gen. Counsel, U. S. Veterans' Bureau, of Washington, D. C., and Luther B. Way, Sp. Asst. to U. S. Atty., of Norfolk, Va. (Paul W. Kear, U. S. Atty., and William Wolff Smith, Gen. Counsel, U. S. Veterans' Bureau, both of Washington, D. C., on the brief), for the United States.

R. C. Cole and L. S. Parsons, both of Norfolk, Va., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

GLENN, District Judge.

This appeal is taken by the government from a judgment in favor of the petitioners, Julia A. O'Brien (formerly Julia Jennings Cartier) individually and as guardian of William Lewis Gaither Cartier, Jr., Virginia Ruth Cartier, and Jacques Cartier. These petitioners below, appellees here, are the beneficiaries of a war risk insurance policy issued by the government to William L. G. Cartier, who had served in the United States Navy. The policy was admittedly in force up to March 1, 1921, and the petitioners have brought suit alleging that the insured had died on or about January 8, 1921, prior to the lapse of the policy. Cartier disappeared on that day and has never been seen or heard of by any one who testified. The petitioner, his widow, brought the fact of his disappearance to the attention of the Navy Department, and this department had found no trace of him at the time of trial in May, 1930. It is easily seen, therefore, that the decision of the case from the evidentiary standpoint turned entirely upon the proof of death before March 1, 1921, the date the policy lapsed for nonpayment of premiums.

Several months after the disappearance of Cartier, the petitioner, then Julia J. Cartier, brought suit and obtained a divorce. The substance of her allegations at that time are as follows: "That the said William Lewis Gaither Cartier has deserted and abandoned your complainant, that is to say on the 8th day of January, in the year 1921, the said William Lewis Gaither Cartier did voluntarily, willfully and without any justification whatever, leave his home for parts unknown to your complainant. Soon after he left, your complainant received a note from the said William Lewis Gaither Cartier in which he said he was leaving her forever and he would never return to her and your complainant has since that time made investigation to ascertain his whereabouts but has not from that day heard from him and that she does not know where he is or whether he be dead or alive."

The petitioner testified that she brought the divorce proceedings on advice of counsel and out of an abundance of precaution. Her counsel, Mr. Cole, corroborated her statement to this effect. We see no great inconsistency between her allegations at that time and her contention now in bringing this suit. She had strong reason to believe at that time that her husband was dead. She alleged the receipt of two suicide notes from her husband in the pleadings asking for a divorce. The investigation up to that time had not disclosed his whereabouts and at that time she did not know positively "whether he be dead or alive." Subsequent investigations have failed to reveal any trace of him and she has now brought suit alleging his death. Recovery was asked on the theory that the insured died in January, 1921. The government denied the death before the lapse of the policy. Two mistrials were had, and the jury on the third trial found for the petitioners. Mrs. O'Brien had qualified as guardian for her minor children, and we refer to her in her individual and representative capacity.

The petitioner testified as to her husband's disappearance and as to his demeanor about that time: "From the time my husband returned from the war to the time he left and I never heard of him any more, he was morose and very seldom had anything to say at home. I never heard anything about a threatened prosecution the day before he disappeared, as suggested by counsel for the Government. He used to play with the children before he went away and was always jolly and lively around the house and after he came back he didn't seem to have any interest in anything. What called my attention to his lack of interest was just his general way of treating us around the house. He would come in in the evening, sit down after dinner, read the paper and sit around and smoke. I mailed a check to the Bureau of War Insurance on December 28, 1920. I had sufficient funds in the bank at that time to take care of that check."

Mr. W. P. Mason, who had employed the insured, testified as follows: "I am W. P. Mason, Norfolk, Virginia, in the manufacturing business, Multistamp Company, in which business I have been for about ten years. I knew William L. G. Cartier. I should say a year or more. He worked for me a short time, approximately two months before he disappeared. I saw him an average of twice a week, I should say, through the time or oftener. He was selling some article for me. So far as I know, I saw him on the day he disappeared. The last time I saw him was on Saturday morning. I do not remember the date. He never came back after that. I saw him in my office with some gentleman I can't recall. The conversation was between Mr. Cartier and some gentleman I can't, for the life of me, recall. There was a conversation between this other man and Mr. Cartier in reference to some obligation between them.

The result of the conversation was that they left my office together and Mr. Cartier nor the other gentleman ever returned. There was a statement made to Mr. Cartier about making good an obligation by a certain hour that day. As I recall, it was then about 9:30 o'clock in the morning on a Saturday morning and the gentleman had a piece of paper in his hand. The statement he made to Mr. Cartier was that he would give him until 10:00 o'clock to make it good that day. They left together and I have not seen or heard from Mr. Cartier since that time."

The record does not disclose whether this financial trouble referred to was simply a debt or whether it was some trouble which might have resulted in a prosecution. Manifestly he would have taken the threatened prosecution more seriously.

Mr. Mason, however, did not agree with the petitioner as to Cartier being morose, but on the contrary found him to be of a rather happy disposition. It is perfectly reasonable that he might have been of good humor around his business but have become melancholy when at home around his family and when contemplating the responsibilities which they entailed.

The petitioner testified that she received the following note, written on an order blank and in the handwriting of her husband, in the 2 o'clock mail January 8, 1921:

"Jan. 8, 1921,
"10:30 A. M.

"Girlie:

"Am doing the most sensible thing I ever did and that is passing out of your life and out of the world forever. I have threatened to do it and can't stand this life any longer. Have degraded you enough and the only one thing to do is what I am doing. I hope you will try to forget the past although it will be mighty hard to do. Have taken the surest way of doing this as there is one which is positive. I know it is cowardly to do this but I can't live any longer as I have lived—have tried hard to be right but have to give up and do the best thing I ever did and that is die. May God bless you and the kiddies.

"Billie"

Mrs. Cartier, during the next week after January 8th, received a second note, in which Cartier told her of his intended suicide. This note was in the following words:

"Have taken Cyanide of Potash and jumped in the River ending a wasted life every one will be better off by my passing out.

"W. L. G. Cartier."

This second note was forwarded to her by a colored woman, Janie Grandy, who lived in the village of Northwest, Va. This village is near the Virginia North Carolina line and is on the Norfolk & Southern Railway, twenty miles from Norfolk. The note had been found in Cartier's coat.

Willie Grandy, a colored boy, explained how the coat was found. In this regard he testified that he remembered a number of years ago seeing a man down at Northwest one Saturday afternoon sitting on a platform right at the bridge. That this man was facing the water and looking down at the ground and got up and walked toward North Carolina. That the man left his coat on the platform, and although Grandy called to him and told him that he had left his coat, he never came back for it. That this was about 4 o'clock in the afternoon, and about 5:30 that evening he picked up the coat and carried it to his grandmother's house. His grandmother could not write and he (Grandy) never did write anything for her with regard to this coat.

There was testimony tending to show that the petitioner made many efforts to find her husband, that she had written to the Navy Department at Washington and many other people in an effort to locate her husband, but was never able to find any trace of him. She testified that she went to Nags Head, N. C., in company with the representative of the Knights of Pythias to view a body that was found on the ocean side or somewhere near Nags Head in the last of January, 1921. She said: "The lodges were making some investigation. When I saw the body I could not determine whether it was the body of my husband on account of the condition the body was in. It didn't look like a human being. I didn't claim at that time that it was his body and to this day I don't know whether it was or was not. There was one thing that might have led me to believe that it would have been him and that was the hair. He had red hair and had a gray streak in the red hair and this body had the gray streak but as far as being him was concerned, I couldn't say to this day whether it was or was not."

The defendant objected to the testimony with regard to this body, but the trial judge admitted it with the following instructions to the jury: "You may consider the fact that

she went down there as showing a willingness to investigate any clues that came to her attention but disregard it as indicating in any sense that it was the body of this man." During the trial there arose considerable discussion as to the proper place of the Nags Head incident in the trial of the case. We think that the trial judge in his remarks to the jury directed their attention to its proper place. The appellant insisted that it was simply injected to becloud the issues. We cannot agree with this contention. The petitioner did not seriously contend that the Nags Head body was her husband's body, but the fact that she went to Nags Head to investigate had an important bearing on the good faith of her contention that her husband was dead. The trial judge showed by his remarks that he so understood this testimony.

The government, appellant, states its main contentions in the summary at the close of its brief in the following terms:

"It is submitted:

"1. That the Court clearly erred in admitting and retaining in evidence the two so-called suicide notes, in their very nature and essence self-serving declarations, because the issue was *not how* insured had died, but *whether he had died at all.*

"2. That there is no evidence in the present case which would warrant the presumption of death of the insured in this case at any time.

"3. Even granting that the insured's death may be presumed from seven years absence, the presumption of death would not attach until the expiration of seven years from January 8, 1921, the time when the insured was last known to have been alive.

"4. That there is no evidence from which it can be fairly found or inferred that the insured died on or before March 1, 1921.

"5. Upon any and all of the testimony in this case it is obvious that the court erred in refusing the Government's motion to direct a verdict at the close of the plaintiff's case and in submitting this matter to the jury for determination."

Clearly the sum and substance of these contentions is that there was error on the part of the trial judge in admitting these so-called "suicide notes." Apart from these notes there was not sufficient testimony in the case to justify its submission to the jury, but on the other hand if the notes were admitted, they, when taken in connection with other supporting evidence, justify its submission to the jury and the resulting verdict in favor of the petitioners.

We think that under all facts and circumstances of this case, the trial judge properly admitted these notes.

The courts have discussed the admission of such notes in a number of cases, and the majority of courts have held that such notes under circumstances similar to those presented by this record are admissible in evidence. Two doctrines seem to have been followed in these rulings, but we think that under either of the doctrines the notes in this case are admissible.

The trial judge in this case admitted them on the legal principle commonly referred to as res gestæ. The appellant admits that such notes are sometimes admitted on the principle of res gestæ when they tend to explain an independent fact which is proven by independent evidence, but the contention here is that it is allowing the independent facts, which the notes tend to explain, to be proved by the notes themselves. In other words, that the petitioners in making out their case are lifting themselves by their own boot straps. Appellant insists that while the notes here might be admissible to explain the death of Cartier if that fact, viz., the death, had been extraneously proved, they cannot be used to prove the death itself. We do not think that the admission of the notes on the res gestæ doctrine is limited to any such narrow view. Suicide is innately an intentional act. There was evidence here quite apart from the notes, tending to show that the insured was in trouble of some kind and that he did actually go away from home.' The notes, if genuine, and the jury was satisfied on that score, were written right at the time when the insured was in the act of leaving his home and business and when he was shown to be in financial and perhaps criminal difficulty.

More than seven years have elapsed and the presumption of death has arisen, so that even on the narrow view of the admissibility of such notes we think that there was a sufficient showing as to the death of Cartier by evidence other than the notes themselves to justify their admission. Such notes have been commonly admitted to show the manner of death where that is the chief issue under investigation. We see no reason why such notes should not be admitted where the time of death is the chief issue to be ascertained. Deliberate suicide growing out of troubles is generally the result of continued worry. In the vast majority of cases when

financial difficulties are the background out of which suicide grows, the suicide is accompanied by some note or final message explaining the reasons for taking this step. Spontaneity is the necessary requisite for the admission of statements oral or written on the principle of being a part of the res gestæ. A man's note to his wife written shortly before actual suicide, and while under the compelling influence of a fixed determination to take his own life, flows from the fountain of strong emotion and fixed intention, just as genuinely as word of mouth spoken in the very commission of the act itself.

It is true there are cases when a suicide note may be part of a fraudulent scheme to recover insurance, but the question then is as to the bona fides of the note. If the facts and circumstances suggest any serious question as to the suicide note being written in good faith, the trial judge would in his discretion exclude such a note. Or if admitted he would direct the attention of the jury to the question of good faith with proper comments. But in this case there was not any substantial showing that Cartier was writing these notes for the fraudulent purpose of simulating a death and collecting along with his wife the proceeds of an insurance policy. We think that the trial judge exercised sound discretion in viewing these notes as spontaneous statements of the declarant made shortly before suicide and while under great stress of emotion and in contemplation of his own death.

The other theory on which such notes have been admitted while closely akin to res gestæ theory is classified under separate headings by many of the text-books on evidence and in some of the cases. See paragraph 520, Elliott on Evidence vol. I. See also statement with citations 22 C. J. paragraph 297, page 281. This view is stated by United States Supreme Court in Mutual Life Insurance Co. v. Hillmon, 145 U. S. 296, 12 S. Ct. 909, 912, 36 L. Ed. 706. To summarize this view as we understand it, it is that such notes may be admitted as tending to show the intentions and state of mind or feeling of the writer where intention or state of mind is of itself a distinct and material fact. We quote in full a paragraph from the opinion of the court in that case: "But upon another ground suggested they should have been admitted. A man's state of mind or feeling can only be manifested to others by countenance, attitude, or gesture, or by sounds or words, spoken or written. The nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen. When the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention. But whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party."

So whether we view the notes as explanatory of the otherwise proven disappearance and presumptive death, or whether we confine our views as to the admissibility of these notes to proof of the state of mind or feeling and intention of the insured on the day when last seen, we cannot escape from the conclusion that the notes were rightly admitted.

The appellant has cited cases where "suicide notes" and "oral declarations of suicidal intentions" were held to be inadmissible, but in all of these there were particular facts which clearly distinguish them from the case at bar. The ruling in United States v. Robertson (C. C. A.) 44 F.(2d) 317 is not in point on the admissibility of the notes at all. It contains at the end of the opinion a very clear statement of the law applicable to the presumption of death at the end of seven years, but it does not profess to deal with the admissibility of any particular evidence. The reported opinion in Prudential Ins. Co. v. Stewart (C. C. A.) 286 F. 321, 323, does not show whether the admission of a "suicide note" was assigned as error—but if it was made the basis of an assignment of error, the exception was overruled by general language at the end of the opinion. The statement of the rule as made by Greenleaf clearly covers the present case (13th Edition vol. I, page 132): "So, also where a person * * * is upon a journey, or leaves home, or returns thither, or remains abroad, or secretes himself; or, in fine, does any other act, material to be understood; his declarations, made at the time of the transaction, and expressive of its character, motive, or object, are regarded as 'verbal acts, indicating a present purpose and intention,' and are therefore admitted in proof like any other material facts. So, upon an inquiry as to the state of mind, sentiments, or dispositions of a person at any particular period, his dec-

larations and conversations are admissible. They are parts of the res gestæ."

■ The appellant directs our attention to the presumption of death arising from seven years' absence. We think that the appellant has magnified the place of the presumption in the case at bar. We agree with the rule as stated in English v. U. S. (D. C.) 25 F. (2d) 335, 336:

"The presumption of death, created by the absence of a person for a period of seven years, is not that he died within that period, but immediately upon the expiration of it. * * *

"But after all, under any view of the law, when one is not content to rest his case upon the common-law presumption of death, arising from absence, but seeks to establish a date of death prior to the end of seven years, he must produce additional evidence. * * * "

■ Manifestly if the petitioner was relying here solely upon the presumption of death, this would not constitute a sufficient showing as to the time of death to justify a jury in concluding that the death took place at any given date, but the presumption of death comes in here in aid of other substantial evidence that Cartier is dead. The jury's conclusion that the death took place before the policy lapsed is manifestly founded upon this additional evidence. Whenever a man dies by drowning and his body is not found, each additional day adds some small weight to the evidentiary showing of his death. Simply because a verdict is consistent with the presumption arising from seven years' absence does not mean that the verdict was founded upon that presumption alone. The trial judge said in this regard: "In this case the Petitioner necessarily asserts that the insured is dead and that he did die within fifty days, between the 8th and 28th of the following month, after his disappearance. The fact that he has not appeared for seven years and the presumption of law which I told you about that applies in such cases doesn't relieve the plaintiff of the burden of proving to your satisfaction, by the greater weight of the evidence, that he did die and that he did die within the particular period of time I have mentioned, namely the fifty days. That is the burden which the plaintiff in this case has imposed by law." See U. S. v. Robertson (C. C. A.) 44 F.(2d) 317.

■ This court would be resorting to speculation to conclude that the jury attributed to

the presumption arising from seven years' absence a greater importance than was given to it by the trial judge in his plain and accurate instructions. The jury cannot resort to speculation to fix the time of death, neither can this court resort to speculation to set aside a verdict and judgment in the face of a full, accurate, and fair charge on the part of the court and a verdict of a jury consistent with reasonable inferences from the testimony.

We think the trial judge correctly admitted the two suicide notes, and as all of the other assignment of errors are clearly without merit, the judgment of the trial court must be affirmed.

Affirmed.