**Elizabeth S. FRIEDMAN, Administratrix of the Estate of John K. Lelemsis, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1480.**

United States District Court
W. D. Arkansas,
Fort Smith Division.

Sept. 9, 1960.

Sam Goodkin, Fort Smith, Ark., for plaintiff.

Charles W. Atkinson, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This is an action on a policy of National Service Life Insurance. The insured, Louie Lelemsis, disappeared while the policy was in full force and effect and has not been seen or heard of since.

The suit was filed on April 9, 1959, by the administrators of the insured's estate and by his brothers as next of kin. After a motion to dismiss was filed by the Government, the complaint was amended with permission of the court, and Elizabeth S. Friedman, Administratrix of the Estate of John K. Lelemsis, the principal beneficiary of the policy, was substituted as plaintiff.

The plaintiff originally requested a trial by jury, but this request was withdrawn at pretrial conference and the issues were tried to the court on August 19, 1960. At the conclusion of the testimony the case was submitted, and briefs were requested from the parties in support of their respective contentions. The briefs have been received and considered along with all the testimony and evidence, and the court now files its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The plaintiff, Elizabeth S. Friedman, Administratrix of the Estate of John K. Lelemsis, deceased, is a citizen of the State of Arkansas and resides in Fort Smith, within the Western District of Arkansas.

#### 2.

Louie Lelemsis was born in Fort Smith, Arkansas, on June 25, 1926. He was the third of four sons. His father was the operator of a combination cafe and tavern in Fort Smith. For some time before Louie was inducted into the Army he assisted his father in the operation of the business, including the function of keeping the books and records of the establishment. In August 1950 Louie entered the United States Army and served in Korea during that conflict.

#### 3.

On December 19, 1950, Louie Lelemsis applied for coverage under the National Service Life Insurance Act of 1940, as amended. Policy No. V 1566 49 51 was issued with the effective date of January 1, 1951, and was for the principal amount of $10,000. This policy replaced an earlier policy in the sum of $5,000. Premiums on the policy were paid through July 31, 1953. John Kost Lelemsis, father of the insured, was designated as principal beneficiary and Tikie John Lelemsis, brother of the insured, was named contingent beneficiary.

#### 4.

In September 1951 he was discharged from the Army and returned to Fort Smith. He was given a ten percent service-connected disability due to a malaria condition. He returned to employment in his father's establishment, but was not happy with the work. He was irritable, nervous, had difficulty in concentrating, and was no longer able to keep his father's records. He would work only under close supervision. About this time he developed an almost fanatical interest in religion, discussing it with anyone who would listen. He felt that it was sinful to work in a tavern. His discontent grew more extreme with the passing of time, and he stated on several occasions that he did not like the kind of life he was leading, that he had nothing to live for, and that he was going to "get rid of himself."

His almost constant companion during this period was a small mongrel dog. The dog was very attached to Louie and accompanied him to the tavern when he was working.

#### 5.

Sometime after returning from the Army, Louie applied for a vocational training program which was available to veterans with service-connected disabilities. He was interviewed in Fayetteville, Arkansas, by C. A. Jacobus, a psychologist and vocational adviser for the Veterans Administration at the University of Arkansas. He was given a mental test and scored within the average ratings. He expressed great dissatisfaction with his present work, yet declined to leave it completely to devote full time to vocational training. Since this program was only available to qualified veterans who would devote full time to it, he withdrew.

**6.**

Louie Lelemsis experienced frequent high fever as a result of the malaria. During these periods, his fever would go as high as 104 degrees and he would become delirious. He consulted Dr. H. C. Dorsey, of Fort Smith, who treated him for the condition. He also received treatment at the Veterans Administration Hospital at Fayetteville, Arkansas, from January 29, 1953, to February 3, 1953. During the time he was in the Veterans Hospital, he was treated by Dr. Samuel P. Stubb, who prescribed certain new medication which was intended to cure the malaria.

On Friday, February 20, 1953, Louie Lelemsis suffered another severe attack of malaria and his temperature again reached 104 degrees.

**7.**

Early on Sunday, February 22, 1953, he had still not recovered from the attack of two days before. His father, John K. Lelemsis, telephoned Roy Taylor, a longtime friend of the family, and requested him to come to the Lelemsis' house and drive Louie to the Veterans Hospital at Fayetteville in John K. Lelemsis' car. Mr. Taylor arrived at the house, and he, Louie, and Louie's dog left in John K. Lelemsis' 1941 Pontiac for Fayetteville. Louie desired to make several calls before leaving Fort Smith, and at his request Mr. Taylor drove him to the office of the Fort Smith Times Record, a local newspaper. Louie was in the newspaper office for a few minutes, and returned to the car, telling Mr. Taylor that he desired to speak to Dr. Fred G. Roebuck, the Pastor of the First Methodist Church. Mr. Taylor then drove the car to the First Methodist Church where Louie got out. It was discovered that Dr. Roebuck had not arrived at the church and was still at home. Louie then returned to the car and instructed Taylor to drive to Dr. Roebuck's home. Louie's conduct during all of the ride was irrational. He frequently told Taylor to disregard stop signs and held his arm to his head and moaned. At one point in the ride he said, "I can walk on the water just like Jesus."

When Taylor stopped the car at a red light, Louie jumped out on the passenger side, ran around the car, opened the driver's door and pulled Taylor from behind the steering wheel, commenting that Taylor's driving did not suit him. Mr. Taylor started to go around the car and get in the passenger side, but Louie drove away before he could do so.

A few moments later he arrived at the home of Dr. Roebuck, who was just preparing to leave for church. Louie pushed his way into the Roebuck home and immediately created an argument by denouncing ministers. After a few minutes, Dr. Roebuck persuaded Louie to leave the house, and he observed him drive away in the 1941 brown Pontiac accompanied only by his dog.

This was the last time Louie Lelemsis was seen alive.

**8.**

When Louie did not return home, his family notified Prentice R. Maddux, Sheriff of Sebastian County, of the disappearance and a search was undertaken. On Thursday, February 26, 1953, William H. Kramer, a friend and fishing companion of Louie Lelemsis, accompanied by Mrs. Kramer, drove out of Fort Smith to Spradling bottoms, a low area near the Arkansas River. Mr. Kramer and Louie had fished in this area on several occasions and Kramer thought he might find Louie there. Upon arriving at the scene, Kramer noticed and recognized the brown 1941 Pontiac automobile owned by the father, which Louie had been driving, parked on a small path. Kramer parked his car, instructed his wife to remain in their car, and walked over to investigate the Lelemsis' car. The doors and windows of the car were closed, and as he looked inside he noticed half of a sandwich, an Eisenhower jacket which Louie had been wearing on the day he disappeared, an Army cap, and a Bible. Louie's small dog was near the car. Kramer observed a man's foot-

prints leading from the car down a small path to the river bank. The tracks were several days' old and had been partially obscured by rain. Dog tracks were also noted leading to the river's edge. The dog tracks returned to the car but the human tracks did not. It was also apparent that the dog had made numerous trips back and forth from the car to the river bank, and had attempted to get inside the car. The dog was extremely hungry when discovered by Kramer, indicating that it had not eaten in several days.

9.

Kramer informed the Lelemsis family of what he had found, and on Friday morning, February 27, 1953, Sheriff Maddux was notified of what Kramer had discovered. He immediately went to the scene and examined the tracks referred to above. At the Sheriff's request, forty soldiers from Fort Chaffee were sent into the area to search for Louie Lelemsis. The entire area was gone over but no further trace of Louie was found. The river was not dragged for the reason that the Sheriff and others in the search party were of the opinion that because of the depth of the river and the swiftness of the current the body had been carried downstream an indefinite distance, or had been covered by rolling sand carried by the current.

10.

A $250 reward was posted by John K. Lelemsis for information concerning the whereabouts of his son. The Sheriff's office sent out 2,500 postcards containing a picture of Louie Lelemsis to Sheriffs and police departments in surrounding states. The full facts relating to his disappearance received extensive coverage on radio and in the press.

11.

John K. Lelemsis, father of Louie Lelemsis and principal beneficiary of the insurance policy, died on July 27, 1954.

12.

On December 27, 1958, a claim for payment of the $10,000 policy was filed with the Veterans Administration. This claim was denied on January 14, 1959.

13.

Louie Lelemsis has not been seen or heard from since February 22, 1953, and his body has never been found.

Discussion

The only genuine issue to be determined by the court in this case is whether Louie Lelemsis died on or before July 31, 1953, while his National Service Life Insurance policy was in full force and effect.

The burden of proof is upon the plaintiff to prove by a preponderance of the evidence that the insured died within the life of the policy. See 29A, Am.Jur., Insurance, Sec. 2001, and cases cited therein. There is no special requirement in the policy or in the statutes that death be proved by an eyewitness, that the body be recovered and identified, or even that death be proved by direct and positive proof. In the absence of such requirements the general principles of insurance law must govern. The general rule in this regard is stated in 29A, Am. Jur., Insurance, Sec. 1931, as follows:

"As a general rule, and in the absence of any policy provision to the contrary, the death of an insured person, the time of death, or the fact that the death or injury of the insured resulted from accidental means, may be proved by circumstantial evidence. It is sufficient if there is a preponderance of the evidence, whether direct or circumstantial, on such an issue, and it is not necessary that the death of the insured be proved beyond a reasonable doubt."

The above rule has been recognized by the federal courts. In United States v. O'Brien, 4 Cir., 1931, 51 F.2d 37, a War Risk Insurance policy case, the court held that the disappearance of the insured, coupled with two suicide notes, his general despondency, and similar circumstantial evidence was sufficient to support

a jury verdict that the insured had died before the policy lapsed.

In Fidelity Mutual Life Ass'n v. Mettler, 1902, 185 U.S. 308, at pages 315–318, 22 S.Ct. 662, at page 665, 46 L.Ed. 922, Chief Justice Fuller, speaking for the Court, discussed the effect of circumstantial evidence of death in the following manner:

"Four propositions are relied on as grounds of reversal, which we will consider in the reverse order in which they are stated in the brief for plaintiff in error.

"I. 'The court erred in not charging the jury to find a verdict in favor of the defendant because of the failure to offer sufficient evidence from which an inference of Hunter's death could be drawn.'

"In our opinion the evidence was sufficient to justify the inference that Hunter was drowned in the Pecos River, on December 4, 1896, and the court below properly refused to peremptorily instruct the jury to find for defendant.

"The question of Hunter's death was a question of fact to be determined on all relevant facts and circumstances disclosed by the evidence. The evidence tended to show that he was last seen alive on December 3d, when he parted from his sister and started for Mentone, with the intention of returning in a few days. He did not arrive nor return, but disappeared. He camped on the banks of the Pecos River; and the abandoned wagon, harnesses, and gun, the starved horse, the ashes of the fire, the used cooking utensils, the fragments of food, the bed with its imprint of the sleeper, bore testimony that he cooked, ate, and slept there, and that he went no farther. The footsteps to the river's brink, going but not returning, the water buckets, the mark of slipping, the fractured root, the flowing stream, indicated what might have happened; and the fact that he was not seen nor heard from thereafter, although his relations with his family were intimate and cordial, and he had always kept up a correspondence with them, so that one or more of them would have been likely to hear from him unless his life had abruptly terminated or its habitual course been suddenly changed, rendered the inference of fatal accident reasonable.

"The record does not set forth the general charge of the court in full, but, among others, this instruction was given: 'While death may be presumed from the absence, for seven years, of one not heard from, where news from him, if living, would probably have been had, yet this period of seven years during which the presumption of continued life runs, and at the end of which it is presumed that life ceases, may be shortened by proof of such facts and circumstances connected with the disappearance of the person whose life is the subject of inquiry, and circumstances connected with his habits and customs of life, as, submitted to the test of reason and experience, would show to your satisfaction by a preponderance of the evidence that the person was dead.'

"Defendant excepted to the giving of this instruction, and requested the court to instruct that 'the circumstances proven must exclude, to a reasonable and moral certainty, the fact that such person is still living, and each fact in the chain of facts from which the death of the party is to be inferred must be proved by competent evidence and by the same weight and force of evidence as if each one were the main fact in issue; and all the facts proven must be consistent with each other and consistent with the main facts in issue, that is, the death of the party.'

"The court did not err in giving the one and refusing the other instruction. This was not a criminal

case, and it was not necessary that the death should be proven beyond a reasonable doubt. The party on whose side the weight of evidence preponderated was entitled to the verdict. Proof to a 'moral certainty' is an equivalent phrase with 'beyond a reasonable doubt.' Gray, C. J., Commonwealth v. Costley, 118 Mass. 1. In civil cases it is sufficient if the evidence on the whole agrees with and supports the hypothesis that it is adduced to prove, but in criminal cases it must exclude every other hypothesis but that of the guilt of the party. It has been held in some cases that when a criminal act is alleged, the rule of reasonable doubt is applicable in establishing that act, but this is not such a case. 1 Greenl., Ev. 15th ed. § 13a, note.

"The court also instructed the jury as follows: 'If from the evidence in this case you should come to the conclusion that Hunter has been continuously absent since December 3d, 1896, without being heard from by his relatives and friends, it should have due weight with you in arriving at your verdict.' 'Absence alone cannot establish the death of Hunter, for the law presumes an individual shown to be alive and in health at the time of his disappearance continues to live. While the death of Hunter is not to be presumed from absence alone, yet it is a circumstance which should be taken into consideration with all the other evidence in the case, and the conclusion of life or death arrived at from all the facts and circumstances, including his continued absence.'

"To this defendant excepted, and it is now argued that there was

error because the court did not call the attention of the jury to defendant's contention that Hunter's continued absence might be attributed to the desire to obtain the insurance money. But it nowhere appears that defendant requested the court to modify the instruction in that particular, and as given it was correct.

"The jury were not left to infer death from the mere fact of disappearance, but were specifically told that that was not in itself sufficient, and that all the facts and circumstances must be considered." [1]

See also Nigro v. Hobby, D.C.Neb. 1954, 120 F.Supp. 16, and Clarke v. States Steamship Co., D.C.N.D.Cal. 1956, 141 F.Supp. 706.

The Government relies upon Mutual Life Ins. Co. of New York v. Zimmerman, 5 Cir., 1935, 75 F.2d 758, in which appellee sought to recover on a life insurance policy by establishing the death of the insured by circumstantial evidence. The Zimmerman case is clearly distinguishable on its facts from the instant case although the basic setting is much the same. There the court said at page 762 of 75 F.2d:

"The theory of actual drowning falls before the facts that there were no tracks to the water and no finding of the body and no reasonable explanation for not finding it under all the circumstances. There is a possibility that he is dead, but the circumstances are not such as to make that the only probable explanation of them. Circumstantial evidence, even in a civil case, must not only consist with the theory that authorizes recovery, but must fairly and reasonably exclude any other explanation of the facts. Unless it

1. It is interesting to note that Hunter, the insured, was subsequently found alive by the insurance company. In this regard, see Fidelity Mutual Life Ins. Co. v. Clark, 1906, 203 U.S. 64, 27 S.Ct. 19, 51 L.Ed. 91. There the Supreme Court held that the attorneys for the plaintiff in the original case, who shared in the proceeds of the policy under a contingent fee contract, were not liable to the insurance company for the amount they received out of the judgment since they had acted in good faith and the jury had found that the insured had died.

does this, the burden which rests upon the plaintiff to prove her case is not carried."

In the instant case there were tracks leading to the water and none leading back. Also, this Circuit has rejected the stricter "exclusion of every other hypothesis rule" in favor of the more liberal "more reasonably probable rule." Bennett v. Wood, 8 Cir., 1959, 271 F.2d 349, 351.

The leading case concerning the disappearance and possible death of an insured under the National Service Life Insurance Program is Peak v. United States, 1957, 353 U.S. 43, 77 S.Ct. 613, 1 L.Ed.2d 631. There the court held at pages 45-46 of 353 U.S., at page 614 of 77 S.Ct.:

"Moreover, nothing in the provision of § 810 that the death of the insured 'as of the date of the expiration of such period may * * * be considered as sufficiently proved' precludes the beneficiary from introducing further evidence from which the jury might conclude that the insured's presumed death occurred at an earlier date when the policy was still in force. United States v. Willhite, [4 Cir.] 219 F.2d 343. The jury might so conclude here, if petitioner can prove the allegations of the complain concerning the insured's frail health and disability or other relevant facts. The presumption leaves it open to prove the precise time of the death, as the statute does not purport to create a conclusive presumption that the insured died at the end of the seven-year period."

Based upon the findings of fact hereinbefore stated, the court is convinced that Louie Lelemsis drowned in the Arkansas River on February 22, 1953.

This is no ordinary disappearance case. The virtually undisputed facts indicate that the insured was suffering from a serious mental or emotional problem which reached a climax on this Sunday morning in February 1953. Here the insured can literally be traced to the edge of a swift deep river, and from there his tracks stopped.

In considering all the facts and circumstances, there is but one inference the court can draw—that Louie Lelemsis went into the water and was drowned. The action of his dog in remaining at the scene from Sunday, February 22, until Thursday, February 26, and in repeatedly journeying back and forth from the water's edge to the car in search of its master is not only a high tribute to a loyal animal, but is likewise a strong indication that its master had gone where it could not follow.

Having found that the insured met his death on February 22, 1953, while the policy was in full force and effect, it is not necessary to discuss the plaintiff's alternate claim based upon a waiver of premiums and the expiration of seven years after the disappearance of the insured. See 38 U.S.C.A. §§ 108 and 712. Since John K. Lelemsis, the principal beneficiary under the policy, was alive on the date of his son's death, the administratrix of his estate is the proper party plaintiff and is entitled to the proceeds of the policy.

Conclusions of Law

1.

The court has jurisdiction of the subject matter and the parties to this action. Title 38 U.S.C.A. § 784(a).

2.

Louis Lelemsis died on February 22, 1953, on which date National Service Life Insurance Policy No. V 1566 49 51 was in full force and effect, and the plaintiff, as Administratrix of the Estate of John K. Lelemsis, is entitled to recover of and from the defendant the proceeds of said policy in accordance with the provisions of 38 U.S.C.A. § 717.

3.

The plaintiff is not entitled to recover interest and costs of and from defendant.

**4.**

A reasonable attorney's fee for plaintiff's attorney is 10 per centum of the amount recovered, and is to be paid by the Veterans Administration out of the payment to be made under this judgment. Title 38 U.S.C.A. § 784(g).

A judgment in accordance with the above is being entered today.